# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

vs.

IRVIN LAMONT WILLIAMS,

       Defendant.

Case No. 26-cr-2013-LTS

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS**

_____

## TABLE OF CONTENTS

                                              **Page**

I.     **INTRODUCTION**......................................................**2**

II.    **FINDINGS OF FACT**................................................**3**

III.   **DISCUSSION**.........................................................**7**

      A.    **The Parties' Arguments** ......................................**7**

      B.    **Analysis**...............................................................**10**

            1.     **Whether the search of the electric bicycle's bag was a valid search incident to arrest**.......................................................**10**

            2.     **Whether the search of the electric bicycle's bag was valid under the vehicle exception**........................................................**16**

                 a.     **Whether the bicycle is a vehicle for purposes of the exception**.....................................................**16**

                 b.     **Whether there was probable cause to search the bag**.............................................................**21**

1

**3.** *Whether the search of the electric bicycle's bag was valid as an inventory search* …………………………………………………**23**

**VI.** **CONCLUSION** ……………………………………………………………**32**

## I.    INTRODUCTION

On March 25, 2026, the Grand Jury returned an Indictment charging Defendant with one count of Possession of a Firearm by a Prohibited Person in violation of 18 U.S.C. Sections 922(g)(1), 922(g)(9), and 924(a)(8).  (Doc. 3.)

The matter before me is Defendant's motion to suppress.  (Doc. 24.)  Defendant's inventory of items includes: a Jimenez Arms 9mm firearm and any associated ammunition seized from a search of Mr. Williams's bicycle, a blue Samsung Smartphone[1] seized, and any evidence derived from the seizure of Mr. Williams's blue Samsung Smartphone, the extraction of any data from the phone, and the review of that data.  (*Id*.)  The Government filed a timely resistance.  (Doc. 28.)  The Honorable Leonard T. Strand, United States District Court Judge, referred the motion to me.  I held a hearing on Defendant's motion to suppress on May 14, 2026.  (Doc. 33.)

At the hearing, these Government exhibits were admitted without objection:

1. Body camera video of Detective Aitchison; and

2. Body camera video of Detective Kramer.

The Defendant's exhibits were also admitted without objection:

A. Report by Detective Kramer;

B. Video of pursuit of Defendant;

C. Video of search of Defendant's e-bike; and

D. Video of Defendant's arrest.

---

[1] The Government represented that it does not intend to offer evidence from the search of Defendant's cell phone.  (Doc. 28 at 3.)  Thus, that aspect of the motion is moot and the Government will be prohibited at trial from offering evidence about the phone.

2

Case 6:26-cr-02013-LTS-MAR    Document 37    Filed 06/29/26    Page 2 of 33

The Government called one witness: Waterloo Police Department ("WPD") Detective Jesse Aitchison.[2] I found Det. Aitchison credible.

For the following reasons, I respectfully recommend that the District Court deny Defendant's Motion to Suppress.

## II.   FINDINGS OF FACT

On February 18, 2026, Defendant was chased on his electric bicycle by WPD officers. After he was stopped, a bag on the bicycle was searched and a firearm was discovered. At the time of the chase, Det. Aitchison was aware of a first-degree harassment charge that resulted in an outstanding warrant for Defendant's arrest. Det. Aitchison had been working on November 14, 2025 when the alleged harassment incident occurred. (Aitchison Hr'g Test. at 4-5.) Det. Aitchison learned that Defendant had threatened the victim with a firearm and threatened to shoot up the victim's residence. (*Id*. at 5.) The victim also told officers that Defendant had previously pistol-whipped someone and was in possession of a firearm. (*Id*.) Det. Aitchison was asked to help locate Defendant, but Defendant's whereabouts remained unknown in December 2025 and January 2026. Also, in January 2026, the victim reported shots fired at the victim's residence where officers located spent 9-millimeter shell casings and damage to the residence caused by gunfire. (*Id*. at 6.) Det. Aitchison acknowledged that there was no evidence linking Defendant to this shooting and Defendant was not charged. (*Id*. at 28.)

At the time of Defendant's arrest on February 18, 2026, Det. Aitchison was aware of aspects of Defendant's criminal history, including a previous conviction for being a felon in possession of a firearm. (*Id*. at 7.) Det. Aitchison was also aware of "local arrest history" showing cautions for carrying weapons, resisting arrest, and assaulting

---

[2] Det.Aitchison has been a police officer with the City of Waterloo for more than 6, the last 3½ years as a detective with the Violent Crime Apprehension Team ("VCAT"). He is a graduate of the Iowa Law Enforcement Academy and has received additional training.

officers. (*Id.*) Finally, as a member of VCAT, Det. Aitchison was aware from Det. Kramer that Defendant was in possession of a firearm and riding a motorized bike within the two weeks prior to his arrest. (*Id.* at 7, 29.)

On the day of the arrest, Det. Aitchison was patrolling near the 700 block of Logan Avenue in Waterloo, an area with a convenience store that VCAT deems a high-crime area, and where law enforcement has responded to multiple reports of weapons violations, drug distribution, and assaults. (*Id.* at 8.) Det. Gavin Kramer was also in the squad car.

While traveling north in the 800 block of Logan Ave in his patrol vehicle, Det. Aitchison recognized Defendant traveling south on a bicycle.[3] (*Id.* at 9; Def. Ex. B.) The recognition happened in a matter of seconds. (Aitchison Hr'g Test. at 22.) Det. Aitchison had never personally interacted with Defendant, but he had seen booking photos from some unknown dates. (*Id.* at 22.) Defendant was not engaged in any illegal activity at the time Det. Aitchison encountered him. Det. Aitchison did not have information that Defendant was engaged in gang activity or drug distribution. (*Id.* at 23-24.)

Det. Aitchison turned his vehicle around to make contact with Defendant. (*Id.* at 10.) Det. Aitchison called out to Defendant, addressing him by name and asking him to stop, but Defendant continued along a sidewalk, through a grassy area, and then down an alley. (*Id.* at 34; Def. Ex. B.) During the pursuit, Det. Aitchison's vehicle left the roadway and followed Defendant on a sidewalk. Det. Aitchison testified that this refusal to stop constituted interference with official acts. (Aitchison Hr'g Test. at 34.)

After Defendant emerged from the alley, he appeared to lose control of the bicycle. The bicycle slid from under Defendant, and he fell on the grass at the side of the street with the bike straddling the curb, partially in the street. (*Id.* at 10; Def. Ex. B at

---

[3] There appears to no dispute that Defendant was riding an electric bicycle or "E-bike."

4

17:01:25.) Det. Aitchison stopped the squad car. (Def. Ex. B at 17:01:26.) Defendant attempted to flee, but Det. Kramer exited the squad car and cut him off. (Aitchison Hr'g Test. at 11.) Det. Aitchison exited the squad car and assisted Det. Kramer in taking Defendant into custody. (*Id.*; Def. Ex. B at 17:01:33.) Defendant was immediately handcuffed behind his back and did not resist arrest. (Aitchison Hr'g Test. at 24-26.) Det. Aitchison testified that it is not uncommon for people with outstanding warrants to run from law enforcement. (*Id.* at 25.)

As officers were discussing the reason for the stop, Defendant shouted, "put my bike up, bro," apparently to a man standing across the street. (*Id.* at 11; Gov. Ex. 1 at 17:02:13, 17:02:18; 17:02:34.) Det. Aitchison recognized the man across the street as Keyshawn Outlaw who he knew from drug distribution and weapons investigations. (Aitchison Hr'g Test. at 12.) Det. Aitchison testified that Defendant was not thoroughly searched while he remained on the ground, as officers would prefer, because it would take longer and "Once he started asking someone else to come get the bicycle, I wanted to get him up into the vehicle faster so we could get the search[4] done." (*Id.* at 13.) Mr. Outlaw was within about 30 feet of the bicycle, and he was not the only bystander. (*Id.* at 14.) None of the bystanders made any effort to "get" the bike. (*Id.* at 31.)

Defendant was cuffed and seated in the back of the squad car by 17:02:44. (Gov. Ex. 1.) Det. Kramer left the door of the vehicle open and continued to speak with Defendant. Det. Aitchison picked up the bicycle at 17:02:53 and then leaned it against the front of the squad car and began searching the bag behind the bicycle seat. At this point, the rear door of the vehicle remained open while Det. Kramer talked to Defendant. Det. Aitchison testified that he immediately searched the bag to avoid someone else locating a firearm he believed was present. (Aitchison Hr'g Test. at 14-15.) Defendant

---

[4] It is not clear whether Det. Aitchison's statement reflects his concern about searching Defendant or the bicycle.

5

was approximately 10 feet from Det. Aitchison, handcuffed, and sitting in the back of the squad car with Det. Kramer standing in the car door when the search commenced. (*Id.* at 27.) Det. Aitchison believed he had probable cause for the search for the following reasons, "Due to the recent -- the previous cases that we just talked about, the weapons investigations, the location that we located Mr. Williams, as well as what happened during the chase, him stepping away from the bicycle and then him trying to get someone else to come get it." (*Id.* at 15.)

Det. Aitchison found a handgun in the bicycle bag at 17:03:24.[5] (Gov. Ex. 1.) The door of the squad car by Defendant was shut and locked within a few seconds. (Aitchison Hr'g Test. at 27.) At 17:03:44, Det. Aitchison mentioned the possibility of impounding the bike. (Gov. Ex. 1.) He testified it was a "higher value bicycle" and he would not simply leave it there to ensure Defendant could reclaim it upon release from custody and to avoid a property dispute. (Aitchison Hr'g Test. at 16.) After recovering the firearm, Det. Aitchison believed he had stronger probable cause to continue the search. (*Id.* at 17-18.)

Det. Aitchison testified that because he had decided to impound the bicycle, he conducted an inventory search to document anything of value and identify potential hazardous items such as uncapped syringes or fixed-blade knives. (*Id.* at 18.) As it happened, the inventory did not identify anything of value that he found necessary to document such as large quantities of cash, phones, or jewelry. (*Id.*) Det. Aitchison was not aware of nearby property where Defendant might want the bicycle to be left. (*Id.* at 19). Additionally, he did not consider leaving the bicycle with Mr. Outlaw because, after the gun was discovered in the bag, Defendant did not ask Mr. Outlaw to take it. (*Id.*)

---

[5] Det. Aitchinson was questioned using lapsed time on the vehicle as opposed to chronological time recorded in the video itself. Thus, this time matches 3:25 of elapsed time. (Aitchison Hr'g Test. at 15.)

Det. Aitchison did not ask Defendant if he wanted the bicycle released to anyone. (*Id.* at 32.)

Det. Aitchison testified that the WPD's procedure for conducting an inventory is to determine if there are valuable items present that should be documented. (*Id.*) He testified that the department has a policy regarding vehicle towing that provides that a vehicle should not be towed if the owner requests it be released to another person who is present. (*Id.* at 33.) Other than the inventory accompanying a vehicle seizure, the WPD does not have a written policy about conducting an inventory search of a bag or about bicycle impoundments. (*Id.* at 36.)

The bicycle itself was identified with a property tag, but the bag was never inventoried; that is, its contents were never itemized and committed to writing. As the officer in charge of the investigation, it was Det. Aitchison's decision not to inventory the bag. (*Id.* at 37-38.)

Ultimately, the bicycle was folded up (which is apparently something bicycles do these days) and placed in the rear of a squad car. (*Id.* at 36.)

### III.    DISCUSSION

#### A.    *The Parties' Arguments*

No warrant was obtained to search Defendant's bicycle bag. The parties agree that a warrantless search requires an exception to the warrant requirement. Thus, I will start with the exceptions proposed by the Government. First, the Government contends the search of the bicycle bag was incident to a lawful arrest. Relying principally upon *United States v. Perdoma*, the Government argues the bicycle and the bag were in sufficient proximity to justify the search, despite the fact Defendant was handcuffed and placed in the rear of the squad car. 621 F.3d 745 (8th Cir. 2010). At the hearing and in its Second Supplemental Brief (Doc. 36), the Government argued that the possible

presence of an unsecured firearm, combined with the presence of others on the scene, justified the search as an extension of the search incident to arrest exception.

The Government also asserts that law enforcement had probable cause to believe a firearm was present and that no warrant was required under the "vehicle exception." (Doc. 28 at 6.) This argument engenders an issue regarding whether a bicycle or an electric bicycle fits within what was originally termed "[t]he so-called 'automobile exception.'" *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005).

Finally, the Government asserts that law enforcement would have inevitably discovered the firearm when searching the bicycle for inventory purposes. (Doc. 28 at 10-11.)

Defendant asserts that the search of the bag was invalid as a search incident to arrest because the bike was not in Defendant's immediate control, he was handcuffed, and he was in the patrol car. (Doc. 24-1 at 5; Hr'g Tr. at 40.) Defendant argues the bicycle was beyond his reach. (Doc. 24-1 at 5.) Defendant distinguishes the instant case from *Perdoma*, because the bag in *Perdoma* was in close proximity to the defendant and he was not locked in a squad car. 621 F.3d at 750. Defendant also offers reasons to distinguish the instant case from *United States v. Morales*, 923 F.2d 621, 626 (8th Cir. 1991) where the defendant was three feet away when his bags were searched and he was not handcuffed. (Doc. 24-1 at 6.)

At the hearing, Defendant denied that the automobile exception applies to an electric bicycle. However, Defendant could not locate authority that addressed the issue. (Hr'g Tr. at 41.) Moreover, Defendant did not offer any argument in support of his assertion that the exception is inapplicable to an electric bicycle. (*Id.*.) Instead, Defendant asserts that even if the automobile exception applies, there was not probable cause for the search. Defendant asserts that the harassment case that resulted in the warrant was three months old and there was no evidence that Defendant had been

8

involved in the subsequent shooting. Defendant asserts the outstanding warrant, not the possible presence of a firearm, explains Defendant fleeing from officers and his other criminal history is dated. Defendant contends he was not in the 700 block of Logan Street, the alleged high crime area, and he was not observed to be engaged in any illegal activity and, therefore, these factors do not support probable cause. (*Id.* at 41-42.)

Defendant contends that the inevitable discovery doctrine does not apply because based on Det. Aitchison's testimony it appears that whether WPD conducts an inventory search is entirely subjective and not part of a standardized procedure. Defendant also argues that there were alternatives to impoundment and noted that Det. Aitchison did not mention the possibility of impounding the bike (and, presumably, the accompanying inventory search) until after he had seen the firearm. (*Id.* at 42-43.)

In response, the Government argued at the hearing that Det. Aitchison was presented a "fluid fast-moving situation" where Defendant was actively requesting someone to take the bicycle and Defendant had run from law enforcement. (Hr'g Tr. at 44.) Under *Perdoma*, the Government argues, the search incident to arrest applies. The Government also believes the automobile exception applies to an electric bicycle. The Government asserts that, in the absence of any case directly addressing an electric bicycle, the inherent mobility of an electric bicycle, and the fact that it is subject to the rules of the road as well as traffic stops for any violations, the exception should apply. Here, the Government argues, there was probable cause for application of the motor vehicle exception based on the incidents over the preceding months and the nature of the arrest warrant. The Government argues that law enforcement had information within the prior two weeks that Defendant was riding an electric bicycle[6] and was carrying a firearm. The Government asserts the facts that Defendant was in a high crime area, he was subject

---

[6] Riding an electric bicycle is not criminal, of course, but the accuracy of this detail tends to corroborate the information about carrying a firearm.

9

to cautions for weapons, he had a previous conviction as a felon in possession of a firearm, he ran from the bicycle (and or police) and then asked others to take it. According to the Government, these facts contributed to the probable cause determination. (*Id*. at 44-47.)

The Government argued that the discovery of the firearm was inevitable because the bicycle could not be left behind without subjecting the WPD to potential claims for its loss and the weapon would be inevitably found during an inventory search. (*Id*. at 47-48.)

**B. Analysis**

**1. Whether the search of the electric bicycle's bag was a valid search incident to arrest**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches are *per se* unreasonable, with a few well-established exceptions. *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). "Among the exceptions to the warrant requirement is a search incident to a lawful arrest." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (citing *Weeks v. United States*, 232 U.S. 383, 392 (1914)). "This exception derives from interests of officer safety and evidence preservation that are typically implicated in arrest situations." *Id*. *See also United States v. Richardson*, 40 F.4th 858, 865 (8th Cir. 2022) (providing that the search of an individual incident to arrest is proper); *United States v. Chartier*, 772 F.3d 539, 545 (8th Cir. 2014) ("'Among the exceptions to the warrant requirement is a search incident to a lawful arrest. . . .' Such a search may include a search of the arrestee's person to remove weapons and seize evidence to prevent its concealment or destruction.") (Quoting and citing *Arizona v. Gant*, 556 U.S. 332, 338-39 (2009), in turn citing *Chimel v. California,* 395 U.S. 752, 763 (1969)).

10

Case law suggests two related branches of the search-incident-to-arrest doctrine that bear upon the facts presented. One branch involves vehicle searches, and the other involves bags or personal effects on or near an arrestee. The parties concentrate on cases where no vehicle is involved. In *Perdoma* and *Morales,* for example, the arrestee was walking in a bus terminal when he was arrested and his bag searched. *Perdoma*, 621 F.3d at 747; *Morales*, 923 F.2d 621, 626. In *Chimel*, the petitioner was in his home when he was arrested. 395 U.S. 754. In *United States v. Shakir*, the defendant was in a hotel lobby when his bag was searched. 616 F.3d 315, 316 (3d Cir. 2010). *United States v. Collier*, involved a defendant arrested while taking his trash out. No. 4:24CR3067, 2025 WL 2426744, at *1 (D. Neb. Aug. 22, 2025). These cases, and the parties herein, focus on whether the bag was in the immediate control of the defendant and, therefore, arresting officers had a safety concern to justify the unwarranted search.

The related branch of the search-incident-to-arrest doctrine involves vehicle searches. In *Belton,* the Supreme Court held that a police officer who has lawfully arrested the occupant of an automobile may search the passenger compartment, even if the arrestee is no longer inside it. 453 U.S. at 459–60, 101 S.Ct. at 2863–64. In addition, law enforcement may also search any containers found within the passenger compartment. *Id.* at 460, 101 S.Ct. at 2864.

In the case at bar, the parties have essentially treated the bag on the electric bicycle as akin to some sort of bag, container, or similar personal item one might carry into a bus station or hotel lobby as they argue whether Defendant had immediate control of it. Regardless of whether Defendant's bag is more akin to the glove box of a car or a backpack in a bus station, Defendant's only objection to the search incident to arrest is that he was not sufficiently in control of the bicycle and bag to permit a warrantless search. By the same token, while the Government treats the bicycle as a vehicle for purposes of arguing the application of the "automobile exception," it has not asserted

11

*Belton* applies to the bicycle's hypothetical passenger compartment – if it can be said to have one. Thus, I will also address this issue without the complicating vehicular dimension of the doctrine posed by the involvement of a bicycle – at least for the purpose of this section of my report and recommendation.

The Eighth Circuit has explained:

Whether an officer has exclusive control of a seized item does not, however, necessarily determine whether the item remains in "the area from within which [the arrestee] *might* gain possession of a weapon or destructible evidence." *Chimel*, 395 U.S. at 763, 89 S.Ct. 2034 (emphasis added). Accordingly, we have rejected the notion that an officer's exclusive control of an item necessarily removes the item from the arrestee's area of immediate control. *See United States v. Morales*, 923 F.2d 621, 626–27 (8th Cir. 1991) (rejecting the defendant's argument that the search of his bags, performed while the defendant was held spread-eagled against a wall three feet away by another officer, was improper because the police had gained "exclusive control" over the bags, explaining that "under this fallacious theory no search or seizure incident to a lawful custodial arrest would ever be valid; by seizing an article even on the arrestee's person, an officer may be said to have reduced that article to his 'exclusive control'" (quoting *New York v. Belton*, 453 U.S. 454, 461–62 n.5, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981)))*; United States v. Mefford*, 658 F.2d 588, 591–93 (8th Cir. 1981) (upholding the search of the defendant's paper bag as a search incident to arrest because the bag remained in the area within the defendant's immediate control even though the arresting officer held the bag during the search); *see also United States v. Tejada*, 524 F.3d 809, 812 (7th Cir. 2008) (noting that the defendant was "unlikely to be able to make a successful lunge for the entertainment center" while he was "[h]andcuffed, lying face down on the floor, and surrounded by the police," but nonetheless holding that the search of the entertainment center incident to arrest was valid because "the police did not know how strong he was, and he seemed desperate"); *United States v. Horne*, 4 F.3d 579, 586–87 (8th Cir. 1993) (upholding a search of furniture that occurred after the defendant and the only other person in the room had been handcuffed, because the arresting officer "could reasonably have believed that weapons were within reach of the hand-cuffed detainees").

12

*United States v. Perdoma*, 621 F.3d 745, 750–51 (8th Cir. 2010). The Eighth Circuit has also stated:

> [I]f an officer has arrested the individual, the officer may search the individual's person incident to that arrest and may reach into his pockets. *United States v. Robinson,* 414 U.S. 218, 226, 236, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). A search incident to arrest is justified by the concern for officer safety and the need to collect evidence of the offense. *Id.* at 234, 94 S.Ct. 467. But, the presence of either justification need not be established in a particular case. That is, officers need not have any reason to think the individual is armed or that evidence of the crime will be found on his person. It is the fact of arrest that enables the officer to conduct a search, not a particularized suspicion as to the suspect's dangerousness. *Id.* at 235–36, 94 S.Ct. 467. Searches incident to arrests are not limitless, but they are unconstrained by the limits enunciated in *Terry* and its progeny regarding frisks.

*United States v. Pratt*, 355 F.3d 1119, 1121–22 (8th Cir. 2004). *Morales* stated,

> Morales relies on *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), *United States v. Schleis,* 582 F.2d 1166 (8th Cir. 1978), and *United States v. Stevie,* 582 F.2d 1175 (8th Cir. 1978), *cert. denied,* 443 U.S. 911, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979), to argue that absent exigent circumstances, a warrant is required to search luggage that has come into the "exclusive control" of police officers. Morales contends that he had an expectation of privacy in his closed luggage, and that while the arrest may have justified the seizure of the luggage, it did not justify its warrantless search. This argument fails to respond to the statement of the Supreme Court in *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), that the "justification for the search is not that the arrestee has no privacy interest in the container, but that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have." *Id.* at 461, 101 S.Ct. at 2864.
>
> The magistrate's report found that the bags were in the "immediate control" of Morales, slip op. at 7, thus applying the proper standard for determining the validity of a search incident to arrest. *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). In *Chimel,* the Court stated: "There is ample justification . . . for a search of the arrestee's

13

person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Id.*

Subsequent decisions of the Supreme Court and this court have interpreted the phrase "immediate control" to extend beyond the area that is conveniently or easily accessible to the arrestee. In *Belton,* the Supreme Court held that a police officer who has lawfully arrested the occupant of an automobile may, contemporaneously with that arrest, search the passenger compartment, even if the arrestee is no longer inside it. 453 U.S. at 459–60, 101 S.Ct. at 2863–64. The lawful scope of this search extends to any containers found within the passenger compartment. *Id.* at 460, 101 S.Ct. at 2864.

Similarly, in *United States v. Palumbo,* 735 F.2d 1095 (8th Cir.), *cert. denied,* 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 268 (1984), we held that "accessibility, as a practical matter, is not the benchmark" in assessing the validity of a search incident to arrest. *Id.* at 1097. The question is whether the evidence is "in the area within the immediate control of the arrestee" under *Chimel*. *Id.* This area "is not constrained because the arrestee is unlikely at the time of the arrest to actually reach into that area." *Id.*

923 F.2d 621, 626 (8th Cir. 1991).

The dash camera video shows Defendant hit the ground after crashing his bicycle at 17:01:25. (Def. Ex. B.) Defendant was on his feet and running almost immediately. (*Id.* at 17:01:27.) He was quickly tackled by Det. Kramer and Det. Aitchison ran past the bicycle to assist in the arrest within a few seconds. (*Id.* at 17:01:32.) At 17:01:42 Det. Aitchison appears to be looking at the area beyond the patrol car and across the street where Mr. Outlaw and others are located. By 17:02:47 (i.e., less than 2 minutes after Defendant crashed the bicycle), Det. Aitchison lifted the bicycle and began the search.

While Defendant was being handcuffed, searched, and placed in the squad car, Defendant had been calling to others nearby to take the bicycle. Det. Aitchison suggested

14

the search of Defendant's person was not as thorough or completed in the usual way because of the presence of others to whom Defendant was calling out. I agree with the Government's description of the events as a "fluid fast-moving situation" where Defendant was actively requesting someone to take the bicycle after Defendant had run from law enforcement. (Hr'g Tr. at 44.) Added to this, the officers knew Defendant was being arrested for a weapons-related charge, they were near a high-crime zone, they had intelligence Defendant was in possession of a firearm, and they recognized one or more bystanders with troubling criminal history. It is worth noting that the safety threat posed by a weapon hidden in a bicycle bag under these circumstances. Moreso than the passenger compartment of an automobile, the bag on the frame of a bicycle is readily accessible to Defendant or a bystander. Additionally, a bicycle could be easily ridden or pushed away from the immediate area, affording a bystander the opportunity to access the bag.

It is also important to note that Det. Aitchison and Det. Kramer were the only two officers at the scene for the first few minutes until other officers arrived. Thus, while it may be a stretch to think Defendant was able to personally assert control over the bicycle and the suspected firearm; it is not unreasonable to conclude that the officer's control was less than entirely "exclusive." Det. Kramer was still securing Defendant in the back of the squad car, leaving Det. Aitchison with a bicycle and a suspected firearm to somehow immediately secure in the presence of the bystanders that Defendant was attempting to involve.

The Government cites *United States v. Goodwin-Bey* regarding the danger posed by the presence of others. 584 F.3d 1117, 1119 (8th Cir. 2009). *Goodwin-Bey* involved the search of three unsecured passengers and one vehicle occupant who had been arrested: "The Government argues that because Goodwin–Bey and the other passengers were not secured, unlike the bystanders in *Gant,* officer safety concerns justified the search.

15

Goodwin–Bey argues that the scene was in fact secure, since the other occupants had been patted down and did not outnumber the officers on the scene." *Id*. The "number of the vehicle's occupants" was a factor in determining there was an officer safety concern justifying the search incident to the arrest. *Id.*

I conclude the search incident to arrest applies because (1) Defendant had been in possession of the bicycle within seconds of the search; (2) the nature of the offense for which Defendant was being arrested related to possession of a firearm; (3) recent information regarding Defendant's possession of a firearm; (4) the presence of bystanders with known criminal history; (5) the presence of only two police officers; and (6) the difficulty in exerting "exclusive" control over the bicycle under these circumstances. Here, the fact that Defendant was not fully secured in the rear of the squad car is also relevant. I conclude that although Defendant was not physically in a position to access the bicycle bag, his efforts to persuade others to take the bicycle presented a similar threat to officer safety.

### 2. *Whether the search of the electric bicycle's bag was valid under the vehicle exception[7]*

### a. *Whether the bicycle is a vehicle for purposes of the exception*

Warrantless searches are *per se* unreasonable, with a few well-established exceptions. *Kennedy*, 427 F.3d at 1140. "The so-called 'automobile exception' permits police to conduct a warrantless search of an automobile if, at the time of the search, they

---

[7] The exception's name is not determinative. The source of the "automobile exception," *Carroll v. United States*, refers to "automobile or other vehicle." 267 U.S. 132, 153 (1925) ("Having thus established that contraband goods concealed and illegally transported in an *automobile or other vehicle* may be searched for without a warrant, we come now to consider under what circumstances such search may be made."). In extending the exception to motor homes, the Supreme Court used the terms "automobile exception" and "vehicle exception" interchangeably. *California v. Carney*, 471 U.S. 386, 391 (1985). I will use "vehicle exception" because the exception has repeatedly been interpreted to include vehicles other than automobiles.

have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Id.* at 1140-41 (citations omitted). The burden is on the Government to justify warrantless searches. *Carter*, 729 F.2d at 940.

To determine whether the automobile exception to the search warrant requirement applies a vehicle must have been "'[1] readily capable' of 'being used on the highways' and must have been '[2] found stationary in a place not regularly used for residential purposes.'" *Holleman*, 743 F.3d at 1158 at (quoting *California v. Carney,* 471 U.S. 386, 392 (1985)); *United States v. Ross*, No. 17-CR-4071-LTS-1, 2018 WL 3091623, at *10 (N.D. Iowa Apr. 11, 2018) ("Under the automobile exception, when officers have probable cause to search a vehicle, "[a] warrant is not required . . . if [the vehicle] 'is being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes.'" (alterations in original) (quoting *United States v. Long*, 900 F.2d 1270, 1277 (8th Cir. 1990)), *R. & R. adopted*, 2018 WL 1911344 (N.D. Iowa Apr. 23, 2018).

As mentioned above, the Government has cited cases that have held the exception applies to bicycles, mopeds, and scooters. (Doc. 32 at 1-2) (citing *State v. Gamboa*, 543 So.2d 1129 (La. Ct. App. 1989); *People v. Allen*, 78 Cal. App. 4th 445 (2000); *People v. Santana*, 212 A.D.2d 404, 405 (N.Y. Ct. App. 1995); *United States v. Brown*, No. 7:15CR00074, 2016 WL 685030, at *3 (W.D. Va. Feb. 18, 2016), *aff'd*, 677 F. App'x 827 (4th Cir. 2017); *United States v. Catlett*, No. 5:09-122, 2010 WL 1643773, at *3 (E.D. Ky. Apr. 21, 2010); *Commonwealth v. Stallings*, CR16-2669, 2017 WL 9833484, at *8 (Cir. Ct. Va. May 1, 2017); *Harris v. Commonwealth*, No. 0717-15-2, 2016 WL 3007994, at *5 (Va. Ct. App. May 24, 2016)). Defendant has not cited cases to the contrary, nor has he proposed a reasoned basis to treat an electric bicycle differently than a car.

17

Here the two *Carney* factors are literally met.  That is, an electric bicycle is "readily capable" of "being used on the highways" and was "found stationary in a place not regularly used for residential purposes[.]"  *California v. Carney,* 471 U.S. 386, 392, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985).  This Court has discussed the basis for the vehicle exception as applied to a trailer parked in a public right-of-way:

> [W]arrantless searches of vehicles are constitutionally acceptable due to the combination of an automobile's inherent mobility and the enhanced police powers that the state exercises over vehicles which, in turn, diminish a person's expectation of privacy in the vehicle.  When it comes to vehicles, therefore, the only aspect of the Fourth Amendment that survives *Carroll* and its many progeny is the requirement that officers possess probable cause to believe contraband will be discovered somewhere in the vehicle.

> The automobile exception was developed out of a need to adapt our understanding of the law to new technologies.  The automobile age initially presented unique challenges to law enforcement that had not been encountered to that point.  These challenges only became more pronounced and multifarious with time.  The rapid proliferation of automobiles and the steady rise in crime—particularly drug-related crime—in the second half of the twentieth century seemed to justify the expansion of the automobile exception.  On the other hand, even as courts have expanded the exception, they have been less inclined to account for other trends and changes in technology that might mitigate the perceived need for the exception.

> The instant case throws the tensions between modern technologies and societal trends and the traditional justifications for the automobile exception into stark relief.  With the advent and integration of cellular communication, wireless internet, mobile tablets, and high quality digital photography, the "severe" and sometimes "impossible burden" of maintaining "the people and equipment necessary to transport impounded automobiles to some central location until a warrant could be secured" that officers once faced no longer exists.

*United States v. Maccani*, 526 F. Supp. 3d 420, 449–50 (N.D. Iowa 2021), *aff'd*, 49 F.4th 1126 (8th Cir. 2022).  In light of *Maccani,* I can imagine reasons that a defendant

18

might try to distinguish bicycles, including electric bicycles, from other vehicles to which the exception has been applied, but none of them are particularly persuasive. The similarities between an electric bicycle and other vehicles that are unquestionably covered by the exception are readily apparent. Defendant's bicycle has wheels, it is legally used for transportation on public roads, and it is subject to the rules of the road. By some measures, an electric bicycle is more mobile than a car or pickup truck. Perhaps it cannot travel as fast or as far as a car on interstate highways, for example. But many adults and children can pick up a bicycle and ride away with limited training and without a license. The electric bicycle at issue appeared capable of zipping down alleys and sidewalks that might have been a challenge to some four-wheeled vehicles. Ultimately, the bicycle was folded up and carried away in the back of a police vehicle. These features make it even more mobile than a car, truck, trailer, motorhome, or even a motorcycle that would need to be towed for impoundment.

On the other hand, while a bicycle is subject to the rules of the road, as Det. Aitchison testified, it may not be subject to the same sort of pervasive government regulation that decreases a bicycle rider's expectation of privacy. Because the parties offered no evidence on the relative pervasiveness of bicycle regulation, I cannot conclude that the degree of regulation should be given any weight in a bicycle rider's expectation of privacy in the vehicle or, ultimately, in considering whether a bicycle constitutes a "vehicle" for the purpose of the exception.

Nevertheless, some obvious features of bicycles tend to weigh against any great expectation of privacy in these circumstances. Bicycles are, by their nature, less private than the interior of cars and concomitantly less private when operated on public roads. In other words, there is little possibility of a bicycle rider furtively reaching into a glove box or under a seat while concealed from public view. It would be more difficult on a public road to surreptitiously slip contraband into a bicycle bag. Based on the limited

19

record before me, I find a bicycle rider's expectation of privacy in a bag attached to a bicycle to be less than the interior of a car. Thus, insofar as the underlying basis of the exception that was discussed in *Maccani,* there is no reason to treat an electric bicycle as something other than a "vehicle" for the purpose of the "vehicle exception" under the facts presented.

The only factor that gives me pause about the application of the exception goes to one of the original justifications for it, i.e., the burden on law enforcement in seeking a warrant for such a mobile subject. As this Court noted,

> The instant case throws the tensions between modern technologies and societal trends and the traditional justifications for the automobile exception into stark relief. With the advent and integration of cellular communication, wireless internet, mobile tablets, and high quality digital photography, the "severe" and sometimes "impossible burden" of maintaining "the people and equipment necessary to transport impounded automobiles to some central location until a warrant could be secured" that officers once faced no longer exists. *Arkansas v. Sanders*, 442 U.S. 753, 765 n.14, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) (abrogated on other grounds by *California v. Acevedo*, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991)). This is not to say that the exigency that justified an immediate search of an automobile in 1925 could never exist today. Police organizations throughout the country have different capabilities and a Fourth Amendment inquiry should remain a case-by-case, fact-intensive affair. The capabilities of modern police forces and the realities of the modern living conditions of many Americans are vastly different than they were in the Seventies, however, and should be considered when applying the automobile exception.

*United States v. Maccani*, 526 F. Supp. 3d 420, 450 (N.D. Iowa 2021), *aff'd,* 49 F.4th 1126 (8th Cir. 2022). While the exception exists because of the inherent mobility of a vehicle, a bicycle can be (and in this case was) easily placed in the back of a squad car and driven away.

20

This might raise the question of whether the vehicle exception is necessary when the subject vehicle could easily be impounded while a warrant is obtained. Here, however, the Court is not presented with an academic question about a hypothetical bicycle that might readily be impounded and subjected to a post-warrant search. Here, the challenges presented to law enforcement make it appropriate to treat the bicycle like any other vehicle. Because of the possible presence of a firearm, the presence of bystanders, and the limited number of officers immediately present, impounding the bicycle for a later warranted search was impractical and potentially unsafe. Thus, I conclude that there is no basis to treat the bicycle as something other than a vehicle for the purpose of this exception under the facts presented.

### b. Whether there was probable cause to search the bag

Having determined that the electric bicycle should be treated as a vehicle, I turn to whether there was probable cause to search the attached bag. "Although a warrantless search usually constitutes a per se Fourth Amendment violation, the automobile exception to the Fourth Amendment's warrant requirement permits the warrantless search or seizure of a vehicle by officers possessing probable cause to do so." *United States v. Soderman*, 983 F.3d 369, 375 (8th Cir. 2020) (citing *Chambers v. Maroney*, 399 U.S. 42, 51–52 (1970)).

> "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Murillo-Salgado*, 854 F.3d 407, 418 (8th Cir. 2017) (quoting *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003)). Because "[p]robable cause is a practical and common-sensical standard," "an officer may draw inferences based on his own experience" to determine whether probable cause exists. *Id.* (internal quotation marks and citations omitted).

21

*Cronin v. Peterson*, 982 F.3d 1187, 1197 (8th Cir. 2020) (finding probable cause existed for a warrantless search of an automobile).

Here, the following information known to law enforcement points to the existence of probable cause. In February 2026, Defendant was wanted on a warrant arising from a November 2025 weapons charge where he allegedly threatened a victim. (Aitchison Hr'g Test. at 5.) The victim also reported that Defendant was in possession of a firearm and had previously pistol-whipped someone. As Defendant accurately points out, this information was three months old. However, officers had information within two weeks of the arrest that Defendant was in possession of a firearm. The same source had told law enforcement that Defendant was riding a motorized bicycle which the officers witnessed on February 18, 2026. In turn, this information tended to corroborate the intelligence about the firearm and support the existence of probable cause.

Defendant also fled from law enforcement both before and after he crashed his bicycle. Det. Aitchison testified that people with outstanding warrants sometimes run from the police. (*Id.* at 25.) Defendant suggests this as an alternative explanation, if not an innocent one, for having fled. In other words, Defendant suggests that he fled to avoid arrest on an outstanding warrant, rather than to avoid a firearm charge. This possibly different (if not innocent) explanation does not diminish the existence of probable cause because there is no evidence that Defendant knew about the warrant. On the contrary, his statements to officers suggest that he was surprised to learn of the warrant.

In addition, Defendant ran from his "higher value" (*Id.* at 16) bicycle after he crashed it. This could be interpreted as an effort to distance himself from the bicycle and any contraband it might have on it. Similarly, Defendant's efforts to have others take his bicycle may have had an innocent explanation (i.e., avoiding impoundment) but law enforcement is not required to accept an innocent explanation. Here, Defendant's flight

22

from police, his flight from the bicycle, and his efforts to have others take possession of the bicycle can all be legitimately considered and weigh in favor of probable cause.

While I have previously noted that Defendant's presence near a high crime area supports the search incident to arrest, I do not find it weighs in favor of the determination of probable cause. Nothing about Defendant being present in an area that may be the site of other crimes made it more probable he was in possession of a firearm. Nevertheless, the other evidence, assessed as a whole, supports the determination that there was a fair probability that contraband or evidence of a crime would be found in the bicycle bag. Thus, I conclude that the vehicle exception applies to Defendant's electric bicycle and there was probable cause to support the search of the bag.

### 3. Whether the search of the electric bicycle's bag was valid as an inventory search

The inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without an unconstitutional violation. *Utah v. Strief,* 136 S. Ct. 2056, 2061 (2016) (citing *Nix v. Williams,* 467 U.S. 431, 443-44 (1984)); *Hogan v. Kelley,* 826 F.3d 1025, 1028 (8th Cir. 2016). The Eighth Circuit Court of Appeals addressed a similar argument in *United States v. Allen*:

> Allen also argues that the district court erred in denying his motion to suppress the evidence discovered on the luggage cart. Even if officers could not search the items on the luggage cart incident to Allen's arrest since he had already been secured in the patrol car, *see United States v. Perdoma,* 621 F.3d 745, 752 (8th Cir. 2010), the evidence found on the luggage cart may still be admissible if the government can show it would have been inevitably discovered. *See United States v. James,* 353 F.3d 606, 616–17 (8th Cir. 2003). If the government "can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . [then] the evidence should be received." *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). For that exception to apply the government must show (1) a reasonable probability that the evidence would have been discovered by

23

lawful means in the absence of police misconduct, and (2) an active pursuit of a substantial, alternative line of investigation at the time of the constitutional violation. *United States v. Conner,* 127 F.3d 663, 667 (8th Cir. 1997).

In this case there is a reasonable probability that the evidence on the luggage cart would have been discovered after Allen's arrest during an inventory search and that the police were pursing an alternative line of investigation. Inventory searches may be conducted without a warrant or probable cause to search, *United States v. Taylor,* 636 F.3d 461, 464 (8th Cir. 2011), so long as they are reasonable under the totality of the circumstances, *United States v. Hall,* 497 F.3d 846, 851 (8th Cir. 2007). An inventory search protects an owner's property while in police custody as well as protecting the police from danger and from subsequent claims about stolen property. *South Dakota v. Opperman,* 428 U.S. 364, 369, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). Officers have broad authority to conduct inventory searches of items "found on the person or in the possession of an arrested person who is to be jailed." *Illinois v. Lafayette,* 462 U.S. 640, 646, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983). Examining "all the items removed from the arrestee's person or possession and listing or inventorying them is an entirely reasonable administrative procedure." *Id.*

At the suppression hearing the government entered into evidence a police department policy governing inventory searches. When asked whether there was "any way [the police] would have just left the items as they were out on the street," an officer answered that they would not "have just taken the two subjects from the vehicle and left all the property in the parking lot." The officer explained that since both Allen and Dean were arrested at the scene, the items on the luggage cart would have been taken to the police station for safekeeping and inventoried to guard against loss or theft. *Lafayette,* 462 U.S. at 644–46, 103 S.Ct. 2605.

71F.3d 382, 387–88 (8th Cir. 2013). Here then, the question is, if Det. Aitcheson lacked justification to search the bag by virtue of the incident-to-arrest exception or the vehicle exception, would the firearm have been discovered during a permissible and inevitable inventory search. The United States Supreme Court has held that "it is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person,

24

to search any container or article in his possession, in accordance with established inventory procedures." *Illinois v. Lafayette*, 462 U.S. 640, 648 (1983). When police conduct a proper inventory search, they are performing their community caretaking function, not their criminal investigatory function, and thus do not need a warrant or probable cause. *United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011). An inventory search "must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990). The Eighth Circuit has said,

> The reasonableness requirement is met when an inventory search is conducted according to standardized police procedures, which generally "remove the inference that the police have used inventory searches as 'a purposeful and general means of discovering evidence of a crime.'"

*Taylor*, 636 F.3d at 464 (quoting *United States v. Marshall*, 986 F.2d 1171, 1174 (8th Cir. 1993)). Conducting an inventory search according to standardized police procedures "vitiate[s] concerns of an investigatory motive or excessive discretion." *Marshall*, 989 F.2d at 1174. However, perfect adherence to a police department's procedures is not required for a court to find an inventory search is reasonable. *Taylor,* 636 F.3d at 465. An inventory search is reasonable "[e]ven if police fail to adhere to standardized procedures . . . provided it is not a pretext for an investigatory search." *Id.* Lastly, officers do not have to approach an inventory search without expectations that they may find evidence of criminal activity. *United States v. Porter*, 859 F.2d 83, 85 (8th Cir. 1988) (per curiam) (noting "an officer's suspicion that evidence may be present does not invalidate an otherwise lawful search").

In *Taylor* the officer violated the specificity requirement of his department's policy and merely wrote "misc. tools" on the inventory form to denote hundreds of valuable tools in the defendant's vehicle. This failure to specify the items in the vehicle or

otherwise attempt to account for them using photographs was "insufficient to remove the inference that the search was investigatory." *Taylor* continued:

> Even if police fail to adhere to standardized procedures, the search is nevertheless reasonable provided it is not a pretext for an investigatory search. "[S]omething else" must be present to suggest that the police were engaging in their criminal investigatory function, not their caretaking function, in searching the defendant's vehicle. Here, the "something else" is found in the officer's testimony at the suppression hearing. Officer Gillespie testified that the basis for the traffic stop, the arrest, the towing of the vehicle, and the inventory search was the officer's belief that Taylor had narcotics in his vehicle. She also testified that she would not have arrested Taylor, impounded his vehicle, or inventoried the contents of the truck if not for her belief that the vehicle contained evidence of a narcotics crime. This testimony leads us to conclude that the search was conducted because police believed they would find evidence of narcotics in Taylor's truck, and thus the inventory was merely a pretext for an investigatory search.

*Id.* at 465.

Determining whether the police conducted a valid inventory search requires answering three questions: (1) Did law enforcement properly impound the property? (2) Was the inventory search conducted pursuant to standardized procedures? and (3) Did the police act in bad faith or for the sole purpose of investigation? *Colorado v. Bertine*, 479 U.S. 367, 37 (1987).

Regarding the first question, I can readily conclude the bicycle was properly impounded. Det. Aitchison's conclusion that he could not reasonably leave the bicycle on the street and unattended is not seriously contested. *United States v. Nevatt* stated:

> The district court did not clearly err when it credited Officer Cooney's testimony. Based on that testimony, a lawful basis existed for the impoundment of Nevatt's motorcycle. "The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *South Dakota v. Opperman*, 428 U.S. 364, 369, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *see also*

26

> *Harris*, 795 F.3d at 823.  Officer Cooney testified that the motorcycle was "in the street" and "create[d] a safety hazard."  Suppression Hr'g at 64.  Nevatt could not lawfully remove it because he lacked insurance.

960 F.3d 1015, 1021 (8th Cir. 2020).

After Det. Aitchison found the firearm, Defendant abandoned the notion of having any of the bystanders take the bicycle and proposed no alternative caretaker.  Thus, there is no basis to conclude that the impoundment itself was some pretext for triggering an inventory search.  Defendant points out that Det. Aitchison first mentioned impoundment after the firearm was found.  (Hr'g Tr. at 42-43.)  Defendant seems to suggest that this discloses an improper motive.  I disagree.  *Taylor* suggests the opposite.  There, the officer testified she would not have subjected the vehicle to an inventory search but for her belief contraband would be present.  Here, Det. Aitchison knew the firearm was present before he verbalized the possibility of impounding the bicycle which, presumably, is accompanied by an inventory search as described below. Thus, it does not appear that Det. Aitchison's statement considering impoundment shows pretext for any part of the search.

The question presented, then, is whether the impoundment and concomitant inventory was inevitable.  I conclude that some inspection of the bag per WPD policy was inevitable, even if it did not produce an inventory.  There is no basis to contradict Det. Aitchison's testimony that there was no alternative manner to dispose of the bicycle under the circumstances.  Defendant had abandoned the idea of giving the bicycle to bystanders and no other manner of disposition presented itself.

Next, I address whether the inventory search was conducted pursuant to standardized procedures.  The Eighth Circuit has stated,

> Morris argues the government failed to prove the CCSO had a standardized policy for impounding and inventorying vehicles.  The record does not contain a copy of the written policy because Morris objected to its admission

27

at trial. However, Deputy Taylor testified about it. According to him, since August 2015, the CCSO has had a written policy about impounding and inventorying vehicles. It designates four times a deputy may impound a vehicle: (1) abandonment; (2) accident; (3) driver arrest; or (4) traffic hazard. The policy allows, but does not require, deputies to release a vehicle to a registered, insured driver. It is CCSO practice to release vehicles only to drivers present at the time of the stop.

Once impounded, the policy requires deputies to inventory a vehicle's contents, including the trunk, for items valued at $25 or more. Although not written in the policy, it is CCSO practice to inventory containers if deputies believe they may have items valued at $25 or more. The policy requires deputies to complete a full inventory unless unreasonable to do so. The absence of the written policy in the record does not preclude establishing its content. "While a written policy may be preferable, testimony can be sufficient to establish police impoundment procedures." *United States v. Betterton*, 417 F.3d 826, 830 (8th Cir. 2005). Based on Deputy Taylor's testimony, the magistrate judge found that Deputy Taylor: [D]id follow the standardized criteria outlined in the written impound policy and the standard practices of the sheriff's office. Deputy Taylor was forthright when he testified. He is familiar with the practices of the sheriff's office, which were the same before and after the impound policy was written. I further credit Deputy Taylor's testimony about the policy and practices in light of his years of service with the sheriff's office, his duties as a routine patrol deputy, and the fact that he impounds vehicles several times per week.

Adopting the magistrate's findings, the district court added, "Regarding his department's policy, Taylor was unwavering that he knew that the arrest of the vehicle driver and existence of a roadside hazard were two instances in which the policy allows officers to impound a vehicle." The district court did not err in finding the CCSO had an impoundment and inventory policy.

*United States v. Morris*, 915 F.3d 552, 555–56 (8th Cir. 2019).

Here, the WPD's inventory policy is unwritten. *Morris*, relying on *Betterton*, shows the absence of a written policy is not fatal and the Court may rely on testimony to

establish the policy.  The following discussion of Det. Aitchison's testimony relates to the terms of the inventory policy:

The WPD has a written policy regarding towing vehicles (Aitchison Hr'g Test at 32) but not the impoundment and inventory of other property.  "In order to avoid property disputes [the WPD officer] often takes their property, such as this bicycle, to our impound or property for safekeeping.  That way the person can get it back after they've been released from custody, which is what happened in this case." (*Id*. at 16.)  Det. Aitchison further testified,

> "[S]ince we were going to impound the bike we do what we call an inventory to make sure there is nothing of value in the bike or to document what of value is inside the bike.  It also includes hazardous items. . . .  That could be another loaded firearm, an explosive device.  Maybe an uncapped needles or syringes, as well as any fixed-blade knives that could poke or harm somebody."

(*Id*. at 18.)  Regarding the substance of the WPD's "standardized procedures" he testified: "Q. What are the Waterloo Police Department's standardized procedures for conducting an inventory?  A. We try to determine if there's any valuable items in that so we can properly document it." (*Id*. at 33.)

Det. Aitchison further testified:

> Q. . . . So with respect to the search of the bag, is there a written inventory policy with the city of Waterloo Police Department?
> A. We have an inventory policy under our vehicle towing section.
> Q. There's not another separate policy that might have to deal with bicycles?
> A. Not that I'm aware of.
> Q. And not one that would have to do with just like luggage or bags that are found on a person at the scene of an arrest?
> A. Not that I'm aware of.

(*Id*. at 36.)

29

Q. . . . So the bike itself was probably identified by make and model and tagged with the bag there, but that's the extent of any inventory that was formally made; is that correct?

A. That is correct.

Q. Now, your determination that there didn't need to be an inventory made because you didn't find anything else valuable in the bag, is that part of any policy you're aware of?

A. No, sir.

Q. And so it's sort of up to the officer who makes the arrest whether there's going to be an inventory made or not?

A. I believe so, or based on the items that are located.

Q. And whose decision is that ultimately? Were you in charge of this investigation?

A. Yes.

Q. So you as the officer in charge of the investigation, you're the one who gets to decide whether there's an inventory made?

A. Yes, I believe so.

Q. And another officer who was in charge of it might look in the bag and decide, well, I know that's a valuable item so I'm going to inventory the contents of the bag; is that right?

A. That's possible.

Q. Okay. And when an inventory of a bag or the contents of a bag are made, it's done by that officer, it's not been, like, sent to the police department and then someone there has to fill out a form that contains everything; how does that work?

A. It can be done either way. We work together often, so if I was busy doing, you know, arrest paperwork another officer will say, hey, I will go through and I will document what's in the bag or I'll complete this property tag for you. Or the officer that, you know, myself in this case could be the one to go through and complete the paperwork.

(*Id.* at 37 -38.)

I conclude that while the WPD inventory policy regarding inventory searches is not particularly rigorous, it is not standardless. The policy, as described by Det. Aitchison, appears to be designed to address legitimate purposes of an inventory search such as avoiding property disputes and avoiding unknowingly taking possession of

30

dangerous items. Obviously, a more exacting inventory policy that required a thorough search and documentation of the contents of all bags might better avoid property disputes. Frankly, the product of this policy might be far from dispositive in an eventual dispute over missing property. By the time a property dispute arises, an actual inventory could be helpful. In cases, like this, where the impounding officer found nothing that he considered valuable, the result of the officer making no inventory amounts to little more than an undocumented supposition that he found nothing he considered valuable. Nevertheless, the policy is not drastically less standardized than the policy in *Morris* which required deputies to

> inventory a vehicle's contents, including the trunk, for items valued at $25 or more. Although not written in the policy, it is CCSO practice to inventory containers if deputies believe they may have items valued at $25 or more. The policy requires deputies to complete a full inventory unless unreasonable to do so.

915 F.3d at 555. The main difference between the *Morris* policy and the WPD policy is the *de minimis* limit set forth in *Morris*. The WPD policy appears to leave this lower limit to the officer's discretion. Even without this expressed minimum value to trigger an inventory of an item, the WPD policy and the *Morris* policy both rely on the officer's discretion and judgment to determine whether to proceed with committing an item to an inventory. While the description of the *Morris* policy seems somewhat ambiguous, it is theoretically possible that an officer could comply with it, as Det. Aitchison did, by making an initial inspection, seeing nothing that meets the threshold value, and completing no written inventory.

Therefore, while the impoundment and inventory policy applicable to the bicycle bag is not in writing and is less than rigorous, I conclude it sufficiently meets the standardization requirement. I disagree with Defendant's assertion that the decision to conclude an inventory is entirely subjective. Whether to ultimately prepare an inventory

31

is at least somewhat subjective. Whether to make an initial assessment of whether a formal inventory should be prepared is both routine and standardized. In other words, the pre-inventory assessment to determine if a full inventory is required seemed inevitable even if the inventory itself may never be prepared.

Finally, I conclude that there is no evidence that supports the notion that "something else" motivated the inventory search. *Taylor* stated,

> Officer Gillespie testified that the basis for the traffic stop, the arrest, the towing of the vehicle, and the inventory search was the officer's belief that Taylor had narcotics in his vehicle. She also testified that she would not have arrested Taylor, impounded his vehicle, or inventoried the contents of the truck if not for her belief that the vehicle contained evidence of a narcotics crime. This testimony leads us to conclude that the search was conducted because police believed they would find evidence of narcotics in Taylor's truck, and thus the inventory was merely a pretext for an investigatory search.

636 F.3d at 465. Here, the pretext analysis is complicated by the fact that Det. Aitchison already knew about the firearm when he decided to impound the bicycle and search its bag. The appropriate question seems to be whether, if Det. Aitchison had not already searched the bag, is there evidence that the inventory search was mere pretext. Defendant points to no evidence, and I see none, that suggests that Det. Aitchison's inventory search was mere pretext. Thus, I conclude that the search of the bag was a valid inventory search.

### IV. CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress. **(Doc. 24.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the

parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 29th day of June, 2026.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa